Sidney Gorman v. Commissioner. Myron A. Keys v. Commissioner.
Gorman v. Commissioner
Docket Nos. 7508, 7509.
United States Tax Court
1947 Tax Ct. Memo LEXIS 330; 6 T.C.M. (CCH) 52; T.C.M. (RIA) 47008; January 23, 1947
*330 Sylvan Rapaport, Esq., 2024 Dime Bldg., Detroit 26, Mich., and Godfrey Hammel, C.P.A., 1248 Free Press Bldg., Detroit 26, Mich., for the petitioners. Wesley A. Dierberger Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: Respondent determined deficiencies in petitioners' income tax liability for 1941 as follows: Docket No. 7508 (Gorman)
$ 53.68
Docket No. 7509 (Keys)
553.75
The deficiencies arise by virtue of respondent having disallowed as deductions by petitioners losses sustained in the operation of a property known as "Pontchartrain Club Property." The question is whether petitioners are entitled to deductions on account of amounts contributed by them to a trustee to enable such trustee to pay taxes, insurance and purchase price interest on real estate in which petitioners and others were interested. Petitioners filed their returns with the collector for Michigan at Detroit. The cases were consolidated at the hearing and have been submitted on exhibits, oral testimony and stipulations of facts. The facts as stipulated are so found. Findings of Fact The Pontchartrain Club Property, hereinafter sometimes *331 referred to as Club property, is located on the southwest corner of First and Bagley Streets in Detroit, Michigan. There is an incompleted structure on the property which was originally intended as a club building. This structure was commenced in 1929 but construction was discontinued later in the same year because of financial difficulties. When further construction was discontinued in 1929 only the outer walls and the roof had been completed. The entire interior is unfinished and has been exposed to the elements because windows have never been put in. No further construction work has been done on this property since 1929. When work was abandoned on the Pontchartrain Club Property, the contractors and subcontractors formed the First and Bagley Holding Corporation (hereinafter referred to as F & B) and F & B proceeded to acquire title to the property, primarily through foreclosure of the mechanics' liens held by the contractors and subcontractors. In acquiring title to the property, F & B purchased certain rights of the Stormfeltz-Loveley Company from its Trustees in Bankruptcy, and in payment thereof gave a note in the amount of $50,000.00, dated November 31, 1934, secured by *332 a mortgage on the property. On July 29, 1938, E. S. Jackson, Edgar H. Sims and Harry Silverman purchased this note and mortgage from the Trustees in Bankruptcy of the Stormfeltz-Loveley Company and assigned them to Sylvan Rapaport for the purpose of having the mortgage foreclosed. Foreclosure proceedings were instituted and the property was bid in by Sylvan Rapaport on February 23, 1940. Under Michigan law, his interest would have become absolute on February 23, 1941. During this time city, state and county taxes which had been assessed against the Pontchartrain Club Property, remained unpaid. It became apparent in 1940 that unless the taxes could be paid, the City or the State of Michigan would acquire title to the property and eliminate the interests of all other parties concerned. On June 21, 1940, F & B and Sylvan Rapaport entered into an agreement wherein they agreed to exert their best efforts to accomplish a sale of the property upon mutually satisfactory terms, and if such a sale was consummated, they would divide the proceeds, after the payment of certain prior expenses, share and shafe alike. In this agreement F & B designated Leo P. Richardson, and Sylvan Rapaport designated *333 Henry Meyers, as their respective agents in connection with the proposed sale of the property. No sale was consummated and the title to the property became vested in the State of Michigan. Both F & B and Sylvan Rapaport had the right to buy the property back at the State of Michigan "scavenger" sale, which would be held on or subsequent to February 11, 1941. On February 11, 1941, an agreement was made by and between F & B, as party of the first part, and Sylvan Rapaport, as party of the second part, and Leo P. Richardson and Henry Meyers, as Trustees. The February 11, 1941 agreement recites that F & B is the fee owner of the Club building and that Rapaport is the holder of a sheriff's deed to the property acquired by the foreclosure of February 23, 1940. The agreement further recites that the State of Michigan had acquired title by virtue of a tax sale and would offer the property at a "scavenger" sale to the public on or subsequent to February 11, 1941. Under these circumstances it was recited that "the parties have, therefore, agreed that in order to preserve their interests in the property above described they will act together for the purpose of purchasing the same upon such *334 sale and eventually disposing thereof upon such terms as shall be to their best mutual advantage." In order to facilitate the progress of the transaction contemplated by the February 11th agreement, F & B designated Leo P. Richardson as trustee and Rapaport designated Henry Meyers as trustee. If these trustees for any reason became unable to act in such capacity they were to be succeeded, respectively, by O. Regis McGuirk and Sylvan Rapaport. These trustees were given general control of all matters relating to the purchase and sale of the Club property. It was provided further that F & B, in its own name but acting as trustee for the parties to the February 11th agreement, should attempt to acquire the Club property from the State at the scavenger sale on the best terms possible. F & B and Rapaport were to each furnish one-half of the money initially required to purchase the property from the State. If F & B successfully acquired the property from the State it agreed to assign the resulting land contract to the trustees of the trustees so requested. With respect to contributions of money which might be necessary for the maintenance of the property pending this sale, the February *335 11th agreement provided as follows: The income from the premises shall be devoted by the trustee to the payment of the amounts due upon the land contract and the taxes which may accrue against the property. When and if further funds become necessary to preserve the interest of the parties in the property from extinction or forfeiture, the Trustee shall call upon the first and second parties hereto for the payment of such further amounts as may be required, and each party shall contribute one-half (1/2) thereof. In the event, however, that either of the parties shall not furnish his or its contribution hereunder when the same shall be required, the other party may make up such difference and thereby acquire a greater proportionate interest in the premises, as hereinafter provided. Neither party, however, shall have any right of action against the other for the failure to make any contribution or for the recovery of any excess contribution. With respect to the distribution of any proceeds realized from the sale of the Club property the February 11th agreement provided, after certain payments not here material, that "the residue of the proceeds shall be divided between the parties *336 hereto in proportion to the amounts of money contributed by each of them subsequent to the date of this agreement and pursuant to its provisions." It was also agreed that "the respective interests of the parties hereto in and to the above described property shall be governed and defined by this agreement." Pursuant to this agreement F & B purchased the property on February 25, 1941 from the State. For this purpose F & B executed a land contract with the State dated April 25, 1941. The purchase price was $34,600 of which amount $3,460 was paid at the time of execution. The balance of the purchase price was payable at the rate of $348.80 a month, which monthly payments included interest at the rate of 6% per annum on the unpaid balance of the purchase price. The purchaser was required to pay taxes and insurance on the property. F & B subsequently assigned this land contract to the trustees pursuant to the February 11th agreement. On April 1, 1941 an indenture was executed by Meyers as trustee as party of the first part, and by Friedman, Meyers and Keys, a partnership, Harry Silverman, Edgar H. Sims, Morris Pomish and the Pomley Corporation, as beneficiaries, as party of the second *337 part. The interests of Friedman, Meyers and Keys as a partnership, Pomish and the Pomley Corporation in the Club property were acquired in various ways and at various times not here material, from Jackson and Silverman which latter persons along with Sims were the original purchasers of the $50,000 note made by F & B in favor of Stormfeltz-Loveley. This note was secured by mortgage on the Club property and the original purchasers of the note and their successors derived their interests in the Club property by virtue of this mortgage which was foreclosed by Rapaport acting as agent on February 23, 1940. The April 1st indenture referred to the agreement of February 11th and stated that Rapaport and Meyers in executing the February 11th agreement acted in behalf of and under the direction of the beneficiaries or their predecessors in interest indicated above. The April indenture contemplated that a land contract would issue to F & B from the State which would be assigned to Richardson and Meyers as trustees under the February 11th agreement. The indenture provided: None of the Beneficiaries under this agreement have or claim any legal title or interest in or to the real estate known *338 as the "Pontchartrain Club Property". Their interests consist of rights to share in profits if and when profits are made from the venture. * * * * *
It is mutually acknowledged and agreed that any profits which may be derived from the Pontchartrain Club Property shall be first divided between Leo P. Richardson and Henry Meyers, as Trustees under the agreement of February 11, 1941, in accordance with that agreement. The share of the profits which comes into the hands of Henry Meyers, Trustee, for distribution to the group represented by him, i.e., the Beneficiaries hereunder, shall be held and distributed by him to the Beneficiaries herein in the following order of priority: STEP ONE First Prior Payment The Beneficiaries shall be repaid the advances made by them since February 11, 1941, and which may hereafter be made by them in connection with the purchase of the property from the State of Michigan and the maintenance and operation of said property. At the date hereof such advances are as follows: Friedman, Meyers & Keys
$500.00
Edgar H. Sims
675.00
Friedman, Meyers & Keys (for the
Jackson interest)
675.00
Harry Silverman
450.00
Morris Pomish (for the Silverman in-
terest)
225.00
*339 If the sums available are not sufficient for all such advances, then the Beneficiaries shall receive payment pro rata on the basis of the amounts advanced by each. STEP TWO Division of Balance The balance of the funds remaining, after making the payments provided in Step One, shall be divided into two portions: Twenty percent (20%) thereof shall be paid to Friedman, Meyers & Keys. The remaining eighty percent (80%) thereof shall be divided in accordance with the following Steps. STEP THREE Priority in Division of Eighty Percent The first Eight Thousand Four Hundred Thirty-Three and 32/100 Dollars ($8,433.32) of the eighty percent (80%) mentioned in Step Two, shall be paid as follows: 1. Two Thousand Forty-Nine and 99/100 Dollars ($2,049.99) for the Jackson interest now held by Friedman, Meyers & Keys. 2. Forty-Five Hundred Dollars ($4,500.00) for the Silverman interest, of which Thirty Hundred Dollars ($3,000.00) is held by Morris Pomish and Fifteen Hundred Dollars ($1500.00) is now held by Harry Silverman. 3. Eighteen Hundred Eighty-Three and 33/100 Dollars ($1883.33) for the Sims interest. The sum of Twenty-Four Hundred Fifty and 1/100 Dollars ($2450.01) *340 will first be paid to the Silverman interest, which will reduce that interest to Two Thousand Forty-Nine and 99/100 Dollars ($2,049.99), which is equal to the next highest interest, to-wit: the Jackson interest. Then equal payment will be made to the Jackson and Silverman interests until their respective interests each equal Eighteen Hundred Eighty-Three and 33/100 Dollars ($1883.33). Thereafter, payments will be made equally to the respective interests until they shall have been fully liquidated. STEP FOUR Division of the Remainder of the Eighty Percent of the Balance of the Proceeds Subject to such changes as may be made by reason of assignments or forfeitures as hereinafter provided, the remainder of the eighty percent (80%) of the proceeds shall be divided as follows: Edgar H. Sims
33 1/3%
Friedman, Meyers & Keys (for the
Jackson interest)
33 1/3%
Harry Silverman
11 1/9%
Morris Pomish
11 1/9%
Pomley Corporation
11 1/9%
4. Under the provisions of the agreement of February 11, 1941, Leo P. Richardson and Henry Meyers, as Trustees, may call upon their respective groups for additional funds to maintain and operate the Pontchartrain Club Property. *341 Failure to provide funds when required may result in the forfeiture of the land contract with the State Land Office Board and the loss of the property to all persons interested. When and as Leo P. Richardson and Henry Meyers, as Trustees, shall call upon their respective groups, the Trustee hereunder shall call upon the Beneficiaries herein for the amount of money required. Such money shall be provided by the Beneficiaries in the following proportions: Twenty per cent (20%) thereof shall be paid by Friedman, Meyers & Keys as their pro rata share under Step Two above provided. The remaining eighty per cent (80%) shall be paid by the various Beneficiaries hereunder pro rata in accordance with their right to participate in the profits under Step Four. * * *
If any Beneficiary hereunder shall fail to meet such call within fifteen (15) days after notice is sent to him, he shall thereupon forfeit all further right to share in the profits which he otherwise would be entitled to receive under Step Four, but he shall be entitled to be repaid the amount of the actual moneys invested by him in accordance with the priority set forth in Steps One and Three. The share of the profits payable *342 to him under Step Four shall thereafter be divided among such of the other Beneficiaries as may provide the funds required by such call pro rata with the funds so advanced by them. * *
In consideration of the execution of the foregoing instrument, I hereby sell, assign, transfer and set over unto HENRY MEYERS, TRUSTEE, all my right, title and interest of whatsoever kind, name, nature or description, whether the same be an interest in real property or in personal property in and to the subject matter of the foregoing trust, and I agree that all of my rights are now expressed in the foregoing instrument. After the purchase of the property by F & B from the State had been agreed to and the land contract therefor had been delivered and assigned by F & B to Richardson and Meyers, the latter took possession as trustees under the February 11 agreement. At that time there was a tenant who operated an auto parking business in the lobby of the Club building. This tenant continued this activity on a month to month basis under the trustees, paying $145 a month for the privilege. This tenant also acted as caretaker of the premises. Richardson and Meyers as trustees maintained a joint *343 bank account into which all income from the property and contributions from the beneficiaries were deposited and out of which all disbursements relating to the property were made. Richardson and Meyers as trustees set up no office and hired no employees. They spent very little time managing the property. Their activities consisted principally of making payments to the State on the land contract once a month and paying taxes and insurance on the property. The trustees and the beneficiaries of the agreement of February 11th all attempted to find a purchaser for the property and, in this connection, reported to each other at various times. An approximate price range had been discussed and agreed to among them. No sale was made. During the taxable year the trustees under the February 11th agreement received $1,194.80 in rents from the tenant operating the auto parking business. During the eight months of 1941 during which the trustees had possession and control of the property they paid the State $348.80 a month on the land contract or $2,790.40, of which amount $1,218.25 represented interest on the unpaid balance of the purchase price. The trustees also paid out $1,710.60 and $677 for *344 city and county taxes, respectively. They paid $257.24 for insurance and miscellaneous expenses in the amount of $38.03. [1] Thus, the property produced income in the amount of $1,194.80 at a cost of $3,901.12, resulting in a loss of $2,706.32. During the taxable year Meyers, as trustee, deposited $1,770 into the joint bank account, which amount had been obtained from the group of beneficiaries he represented pursuant to the terms of the April 1st indenture. During the same period Richardson deposited $1,770 into the joint bank account which he had obtained from F & B which interest he represented. Meyers, as trustee, filed an income tax return for 1941 on a partnership form, Form No. 1065. The business or profession of the entity on behalf of which he filed was stated as "Inactive Holding Title to Real Estate." To the question on the return "Nature of Organization" it was stated in answer "Joint Venture". As items of income and deductions were reported one-half of the total income and expense of managing the Club property. Thus, $597.40 was reported as income from rents. As deductions for interest, taxes and other amounts *345 authorized by law were reported, respectively, the amounts of $609.13, $1,193.80 and $147.63, The latter amount was explained on Schedule F as consisting of $128.62 for insurance and $19.01 for miscellaneous items. The loss reported was in the amount of $1,353.16. Schedule J of the return was as follows: Per
cent
Loss
Friedman, Meyers & Keys - 2024
Dime Bank Bldg., Detroit
26.66
$ 360.75
Mrs. Edgar Sims - 1166 National
Bank Bldg., Detroit
26.67
360.89
Morris Pomish - 18650 Wooding-
ham Dr., Detroit
8.89
120.30
Bertrand J. Sauber - 1023 Ken-
sington, Detroit
18.89
255.61
Sidney Gorman - 2762 Grand
River, Detroit
18.89
255.61
$1,353.16
Sauber and Gorman acquired their interest by assignments, respectively, from Pomish and Silverman. The assignment to Gorman from Silverman was dated November 13, 1941. Gorman's individual income tax return for 1941 reported on Schedule I thereof the amount of $255.61 as a loss under the designation "Pontchartrain Club Property, Henry Meyers, Trustee." Friedman, Meyers and Keys filed a partnership return for 1941 on which as item 10, was reported a loss in the amount of $360.75 designated "Henry Meyers, *346 Trustee." Petitioner Keys filed an individual income tax return for 1941 on Schedule I on which was reported the amount of $456.76 as a loss derived from Friedman, Meyers and Keys' investment. Of this amount $120.25 represents petitioner Keys's share of one-third of the partnership loss of $360.75 mentioned above. Respondent in his deficiency notice increased petitioner Gorman's income from partnership sources by the amount of $255.61 for 1941. Respondent in the deficiency notice to petitioner Keys, increased the latter's income from partnership sources for 1941 in an amount which included, among other items, the amount of $120.25 claimed by petitioner Keys as his share of the loss reported by the partnership of Friedman, Meyers and Keys with respect to the Club property. The disallowances were explained by respondent in the statements accompanying the notices of deficiencies to each of the petitioners in part as follows: It is held that your proportionate part of an operating loss sustained by Pontchartrain Club Building, Henry Meyers, Trustee, * * * claimed as a deduction from gross income does not represent a proper deduction from gross income. Opinion Respondent contends *347 that the organization resulting from the agreements of February 11 and April 1 was an association taxable as a corporation and that, therefore, any loss sustained by such association is deductible by it and not by the individual taxpayers herein. Alternatively, respondent contends that if the organization in question be considered a trust, in that event any loss sustained by the trust entity should be deducted by it and not by the individual taxpayers herein as beneficiaries. Petitioners, on the other hand, contend that the organization in question was a joint venture and that they as joint venturers or partners are entitled to deduct their share of any loss sustained as a result of the venture. Alternatively, petitioners contend that if the organization be considered as a trust that they, nevertheless, are entitled to a deduction under the reasoning of Cornelia C. F. Horsford, 2 T.C. 826. We think it obvious from the terms of the agreement of April 1, 1941, recited in our findings of fact and from other facts found herein, that petitioners together with others designated as "beneficiaries" in the agreement were the purchasers of proportionate interests in the real property *348 involved as evidenced by the contract of purchase under the "scavenger" sale and that Meyers, designated "trustee" in the agreement of April 1, 1941, was merely their nominee and agent in the transaction. Meyers by virtue of the agreement had certain duties imposed upon him, among which were to collect rents and to apply same to payments on the purchase contract, the payment of taxes, insurance, and other expenses pertaining to the property. Also it was Meyers' duty to call upon the "beneficiaries" to contribute proportionately to their interests such amounts as were necessary, supplementary to the rentals, to complete the above designated payments. The making of such contributions, provided for in the agreement, was required to protect the interests of the "beneficiaries" in the property purchased. Meyers had no beneficial interest in the property or the purchase contract but he was merely constituted the agent of petitioners and the other "beneficiaries" under the agreement to perform on their behalf the contract of purchase and to perform other functions necessary to protect their interests in the property purchased. Meyers and his co-trustee, Richardson, could sell the property *349 only by and with the approval of the beneficial owners thereof. In the event of such sale the agreement prescribed the method of distribution of the proceeds to the beneficial owners. Regardless of the designation ascribed to the relationship established between Meyers and the "beneficiaries" under the agreement referred to and the other facts found herein, the fact remains that petitioners in the taxable year paid taxes, interest, insurance and incidental expenses in respect of the property involved in proportion to their respective rights therein to protect and preserve such rights. Each of the petitioners was compelled to make contributions for such payments or lose his rights, or a substantial part thereof, in the property. The amounts so paid for the specified items were deductible by petitioners and constitute the same payments and amounts reflected in the disallowed deductions involved herein. The deductions should be allowed. Cf. Cornelia C. F. Horsford, supra. In view of our opinion as above expressed we deem it unnecessary to discuss categorically the stated contention of the parties hereto. Decision will be entered for petitioner in Docket No. 7508. *350 Decision will be entered under Rule 50 in Docket No. 7509. Footnotes
1. 86 cents bank charge as per Exhibit 15 not included.↩